IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31175-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TYLER L. JAMISON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, A.C.J. — Tyler Jamison choked, smothered, squeezed, and bounced his infant daughter, S.J., on multiple occasions, in an attempt to stop the baby's crying. Jamison fractured his daughter's ribs, bruised much of her body, and caused her severe brain damage. As a result of the horrific acts, S.J. is now blind. A feeding tube sustains her. She is "nonresponsive."

In a case that engenders many tears, a jury found Tyler Jamison guilty on two counts of first degree assault of a child for assaulting S.J. on or about April 5, 2010 in violation of RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii). On appeal, Jamison argues these two convictions stem from the same criminal conduct, violating his right to be free of double jeopardy. In the alternative, Jamison argues that his two convictions arose from the same criminal conduct for purposes of sentencing under RCW 9.94A.589 and must run concurrently. We reject both of his arguments, affirm both convictions, and

affirm the sentences.

## FACTS

Kelsey Goble and Tyler Jamison are the parents of S.J. Goble lived in foster care much of her life because her parents were in prison. Defendant Tyler Jamison and she became friends during their sophomore year of high school, and Goble moved to Jamison's mother's home, where the three lived together. Within a year, Goble became unexpectedly pregnant. Goble moved into her own apartment, and Jamison followed. Kelsey Goble gave birth to S.J. on February 8, 2010, on which date both Goble and Jamison were 18 years old.

The beginnings of Tyler Jamison's abuse of his infant daughter is sketchy, but began at least by mid-March 2010. Jamison later told law enforcement officers, "[T]here were times where he would be tired from staying up all night playing video with his friends and that he could just not figure out how to get her [S.J.] to stop crying and that's why he started doing these things." Report of Proceedings (RP) at 906. "These things" included pressing his fingernails on S.J.'s throat. RP at 880. He noticed that after applying pressure for 15 seconds, S.J. turned pale. By late March, Jamison stopped using fingernails on S.J.'s throat because of cuts caused to the throat. Jamison switched to smashing S.J.'s nose and covering her mouth until she turned pale.

On some occasions, Tyler Jamison squeezed S.J. tightly until she stopped crying. When she would not cease crying, Jamison repeated the squeezing. Tyler Jamison

2

sometimes placed S.J. on the couch, placed his hands on either side of her, and bounced on the couch cushion. S.J. bounced off the couch cushion, her head snapped back and forth, sometimes with her chin making contact with her chest, other times with the back of her head striking her back or the arm of the couch. The arm of the couch had padding, but was solid wood.

The frequency of the abuse of S.J. by Tyler Jamison is unknown. Kelsey Goble apparently first noticed physical ailments in S.J. on March 17, 2010. On that date, Goble and Tyler Jamison brought S.J. to the emergency room at Spokane's Holy Family Hospital because S.J. had a weak cry and was spitting. Jamison told Dr. Timothy Veenstra that S.J. seemed to be turning pale, but had not stopped breathing. Veenstra examined S.J. and found her well nourished, well hydrated, and in generally good health.

On April 3, Kelsey Goble took S.J. to Jamison's mother, Michelle Jamison, who baby-'sat S.J. for the night. At trial, Michelle testified that during the night S.J. vomited, appeared lethargic, and her eyes rolled back into her head while feeding.

On April 4, Michelle Jamison and Kelsey Goble met at a family friend's home, where Michelle returned S.J. to Goble. On the way to the friend's home, S.J. vomited. Upon her arrival at the home, Goble noticed a bruise on S.J.'s left eyelid. To clean the vomit, Kelsey Goble and the friend, Hope Belieu, bathed S.J. Belieu did not notice any marks or bruises on S.J.'s body.

At trial, Kelsey Goble testified that S.J. appeared unusually drowsy on April 4. In

3

the evening, Kelsey Goble, Tyler Jamison, and S.J. returned to their home. Goble

planned to begin classes at community college the next day. So Jamison cared for S.J. in

their living room while Goble slept. Around 4:15 a.m., Goble awoke to S.J. screaming.

Goble changed S.J.'s diaper and fed her. S.J. ate without trouble, and returned to sleep.

During the morning of April 5, Tyler Jamison watched S.J. while Kelsey Goble

prepared for school. At 7:10 a.m., Goble tried to place S.J. in a car seat so that Jamison

could drive Goble to school. But S.J.'s legs locked in place. Goble later testified:

> A. Her legs locked when we were trying to put her in the car seat,
> which is really weird. I'd never had that happen before.
> Q. And what do you mean, "locked"?
> A. Like they were out and they were straight and stiff, and I couldn't
> get them to bend. I had to wait until her body did it itself, and they were
> locked for like five minutes.

RP at 592. Goble asked Jamison to call their doctor and make an appointment, which he

made for 1:00 p.m that day. Jamison and S.J. dropped Goble off at school around

7:30 a.m. Jamison and S.J. returned home.

On the morning of April 5, Tyler Jamison repeatedly choked, smothered,

squeezed, and bounced his infant daughter S.J., because of her crying. S.J.'s eyes went

different directions after her smothering. The left eye looked straight ahead and the right

eye looked up. When S.J. shut her eyes, they popped back to normal. S.J. began a

swimming motion with both of her arms that did not stop for the rest of the morning. S.J.

encountered problems breathing, so Jamison bounced S.J. on the couch in an attempt to

4

revive her. S.J. struck her head on the arm of the couch at least twice. In order to revive S.J., Jamison also placed her on his thighs, laid her on her back, and poked her in the chest. Jamison pressed down hard enough to actually feel in between her ribs so he could help get S.J.'s "breath out." RP at 903. S.J. began a sipping sound and became unresponsive.

Tyler Jamison and S.J. retrieved Kelsey Goble from school around 11:15 a.m. Goble then noticed that S.J. "was doing a swimming motion with her arms." RP at 593. Jamison told Goble that S.J. had been moving her arms like that since around 8:00 a.m. Goble also noticed that S.J.'s breathing was shallow. Jamison, Goble, and S.J. went to the bank for Goble to cash her financial aid check. When Goble returned to the car, S.J. still performed the swimming motion but her breathing seemed shallower. Goble contacted the doctor's office to check for an earlier appointment. Following the office's advice, Goble and Jamison took S.J. to the emergency room.

Kelsey Goble, Tyler Jamison, and S.J. arrived at Holy Family Hospital's emergency room at 12:19 p.m. S.J. breathed quickly and her heart beat rapidly. A computed tomography (CT) scan showed internal bleeding in her skull, recent rib fractures, and rib fractures "from an earlier injury." RP at 336. Emergency room physician Dr. Todd Ewert arranged for S.J.'s transfer to Sacred Heart Children's Hospital's pediatric intensive care unit. Ewert suspected child abuse and ordered that Child Protective Services (CPS) be called.

5

At Sacred Heart, police approached Kelsey Goble and Tyler Jamison. Both agreed to accompany Detectives Mark Burbridge and Neil Gallion to a police station for interviews. The detectives interviewed Kelsey Goble first and she provided a timeline for S.J.'s activities. Detectives Burbridge and Gallion next interviewed Jamison. He told the detectives he suspected his mother of abusing S.J., and repeatedly denied hurting S.J.

On April 6, Tyler Jamison called Detective Mark Burbridge. Jamison told Burbridge that he wanted to come to the police station and talk with him. After Jamison arrived at the station, Detective Neil Gallion asked Jamison what he wanted to say. Jamison responded, "I am the one who did it." RP at 894.

On April 6, Detectives Burbridge and Gallion interviewed Tyler Jamison for 30-45 minutes, beginning around 4:30 p.m. The detectives did not record the interview. Detective Burbridge then asked Jamison to consent to a second videotaped interview and Jamison consented. Over the course of the interviews, the detectives heard Tyler Jamison describe his abuse of S.J.

On April 6, pediatric neurologist James Reggin, examined S.J. Dr. Reggin found bruising on S.J.'s eyelid, sternum, cheek, back, and ears. "And her soft spot, the anterior fontanelle, was tense and bulging." RP at 222. Dr. Reggin saw bleeding into the back lining of the eye into the retina. A CT scan showed progressive cerebral edema, or swelling in the brain, resulting from a lack of blood flow and oxygen. Reggin testified at trial, "She was critically ill. She had a very severe neurological dysfunction with very

minimal appropriate responses but still showing some preserved brain stem responses."

RP at 223.

Many physicians testified at trial about the severe injuries to S.J. Multiple doctors testified that a lack of oxygen and blood flow caused brain damage. Pediatrician Michelle Messer testified that S.J.'s swimming motions signaled "a very bad brain injury." RP at 677. Pediatric ophthalmologist Caroline Shea testified that a concussive injury likely caused damage to S.J.'s eyes.

At trial, Dr. James Reggin opined that S.J. suffered most of her injuries within 24 hours of April 5, but noted "there were other signs that there'd been other injuries at a different time." RP at 257. Radiologist Trent Sanders estimated that S.J. bore earlier rib fractures about two weeks prior to April 5.

S.J.'s tragic condition has not improved since April 2010. S.J. lives "essentially in a vegetative state." RP at 279. As of September 17, fluid had replaced much of S.J.'s brain tissue. Her brain lost the ability to "control hormones." RP at 377. At 10 months old, S.J. showed signs of puberty, including growing of breasts. S.J. cannot swallow. A feeding tube sustains her. S.J.'s gag reflex no longer functions to protect her airways. She is blind. She will never recover.

## PROCEDURE

On May 5, the state of Washington charged Tyler Jamison with first degree assault of a child along with three aggravating factors: (1) S.J. was a vulnerable victim, (2)

7

Jamison abused a position of trust, and (3) Jamison's conduct had a destructive and foreseeable impact on persons other than S.J. The State alleged Jamison intentionally assaulted S.J. "on or about April 5, 2010," either in violation of RCW 9A.36.120(1)(b)(i) or, in the alternative, RCW 9A.36.120(1)(b)(ii). Clerk's Papers (CP) at 1-2.

Two years later, the State amended the information and split the alternative means for violating RCW 9A.36.120 into separate counts. The State thereby charged Jamison with two counts of first degree assault of a child. Each count alleged the assault occurred "on or about April 5, 2010." CP at 51-52.

The trial court gave separate jury instructions for counts one and two of first degree assault of a child. Jury instruction 11 addressed the first count and read:

> To convict the defendant of the crime of assault of a child in the first degree as charged in count I, each of the following elements must be proved beyond a reasonable doubt:
> (1) That on or about the 5th day of April 2010, the defendant intentionally assaulted [S.J.] and recklessly inflicted *great bodily harm*;
> (2) That the defendant was eighteen years of age or older and [S.J.] was under the age of thirteen; and
> (3) That this act occurred in the State of Washington.

CP at 161 (emphasis added). The instruction is based upon 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.35.02 (3d ed. 2008) (WPIC). In a separate jury instruction, the trial court defined "great bodily harm" as "bodily injury that creates a probability of death, or that causes significant serious permanent

disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ." CP at 175.

Jury instruction 12 covered count two and read:

> To convict the defendant of the crime of assault of a child in the first degree, as charged in count II, each of the following four elements must be proved beyond a reasonable doubt:
> (1)    That on or about 5th day of April 2010, the defendant intentionally assaulted [S.J.] and caused *substantial bodily harm*;
> (2)    That the defendant was eighteen years of age or older and [S.J.] was under the age of thirteen; *and*
> (3)    That the defendant had previously engaged in a *pattern or practice* of assaulting [S.J.] which had resulted in bodily harm that was greater than transient physical pain or minor temporary marks; and
> (4)    That any of these acts occurred in the State of Washington.

CP at 162 (emphasis added). This instruction arises from WPIC 35.35.03. In another instruction, the trial court defined "substantial bodily harm" as "bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." CP at 176.

The trial court further instructed the jury, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on the other count." CP at 159.

The jury found Jamison guilty on both counts, with three aggravating factors for each. Jamison argued at sentencing that his convictions for both count one and count two violate his right against double jeopardy. Jamison also argued that count one and count

9

two are the same criminal conduct for purposes of RCW 9.94A.589. In its "Findings of Fact and Conclusions of Law Regarding Exceptional Sentence," the trial court found, "These offenses occurred over a several hour period of time and count II also included assaults that had occurred repeatedly in the weeks prior. The types of assaults on April 5, 2010 were distinct and caused different types of harm. Count II occurred over the course of several weeks." CP at 252. The court thus concluded, "The offenses in counts I and II are separate courses of conduct and the defendant shall be sentenced for each of these convictions." CP at 252. The trial court imposed an exceptional sentence of 180 months' confinement on each count and ordered the sentences to run consecutively under RCW 9.94A.589(1)(b), for a total sentence of 30 years.

## LAW AND ANALYSIS

### Double Jeopardy

The jury convicted Tyler Jamison of two assaults committed "on or about April 5, 2010." CP at 51. Jamison admits to several actions against S.J. on that date. But he argues that each discrete action does not constitute a new assault, and that, when multiple actions are taken against the same victim within a short time span, only one assault occurs. In short, Jamison argues that his assault of S.J. amounts to one "unit of prosecution." We disagree.

10

Despite charging Tyler Jamison with two counts, the state of Washington charged

both counts under one statute, RCW 9A.36.120, which criminalizes assault against a

child. The statute provides:

> (1)   A person eighteen years of age or older is guilty of the crime of
> assault of a child in the first degree if the child is under the age of
> thirteen and the person:
>     (a)   Commits the crime of assault in the first degree, as defined in
> RCW 9A.36.011, against the child; or
>     (b)   Intentionally assaults the child and either:
>     (i)    Recklessly inflicts *great bodily harm*; or
>     (ii)   Causes *substantial bodily harm, and* the person has
> previously engaged in a *pattern or practice* either of (A) assaulting the
> child which has resulted in bodily harm that is greater than transient
> physical pain or minor temporary marks, or (B) causing the child physical
> pain or agony that is equivalent to that produced by torture.
>     (2)   Assault of a child in the first degree is a class A felony.

(Emphasis added.) Note that under subsection (b), the perpetrator may commit the crime

in two alternate ways: (1) intentionally assaults the child and recklessly inflicts great

bodily harm, or (2) intentionally assaults the child and causes substantial bodily harm,

while the accused has engaged in a pattern of practice of assaults or torture. The trial

court instructed the jury on the alternate means of convicting Tyler Jamison under the

statute and the jury convicted on both.

One flaw in Tyler Jamison's argument is that he assumes he can be convicted only

for his conduct on April 5. Both counts encompass assaults beyond April 5. The State

charged Jamison with two counts of first degree assault of a child to account for the

magnitude of harm caused and the ongoing pattern of abuse. Our analysis extends

further, however.

Tyler Jamison contends that his two convictions for assault of a child in the first

degree under RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii) violate his right

against double jeopardy. This court reviews claims of double jeopardy de novo. *State v.*

*Smith*, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013).

The United States Constitution provides that a person may not be subject for the

same offense to be twice put in jeopardy of life or limb. U.S. CONST. amend. V.

Similarly, the Washington State Constitution provides that a person may not be twice put

in jeopardy for the same offense. CONST. art. I, § 9. The double jeopardy clauses of the

United States and Washington State Constitutions protect a defendant from multiple

convictions for the same crime. *State v. Tvedt*, 153 Wn.2d 705, 710, 107 P.3d 728

(2005); *State v. Green*, 156 Wn. App. 96, 99, 230 P.3d 654 (2010).

A defendant's double jeopardy rights are violated if he or she is convicted of

offenses that are identical both in fact and in law. *State v. Calle*, 125 Wn.2d 769, 777,

888 P.2d 155 (1995); *State v. Johnson*, 96 Wn.2d 926, 933, 639 P.2d 1332 (1982). In the

case on appeal, the convictions are neither identical in law or fact. We focus on the lack

of factual identify.

In keeping with the purpose of the double jeopardy clause, if each count arises

from a separate and distinct act, the defendant is not potentially exposed to multiple

12

punishments for a single act. *State v. Fuentes*, 179 Wn.2d 808, 318 P.3d 257 (2014);

*State v. Mutch*, 171 Wn.2d 646, 662, 254 P.3d 803 (2011). An illustrative decision is

*Mutch*, 171 Wn.2d 646. Richard Mutch was convicted of five separate counts of rape

based on five acts that occurred with the same victim over the course of one night and the

following morning. Mutch admitted to engaging in multiple sex acts, and he did not

argue insufficiency of evidence as to the number of alleged criminal acts or question the

victim's credibility regarding the number of rapes. The court found that the jury knew

that each count represented a separate act and that no double jeopardy violation occurred.

Jamison's two convictions do not offend the double jeopardy prohibition because

he committed more than one offense, act, or transaction. He committed multiple attacks

or intrusions on the safety of his daughter. Moreover, each count required proof of a

legal element, which the other does not. Count one required the jury find Jamison

"recklessly inflicted *great* bodily harm," whereas count two only required that Jamison

"caused *substantial* bodily harm." The court's instructions to the jury defined "great

bodily harm" as more severe than "substantial bodily harm." Count two uniquely

required the jury find that the defendant had previously engaged in a pattern or practice

of assaulting S.J., which resulted in bodily harm that was greater than transient physical

pain or minor temporary marks. While count one refers to a singular "act," count two

refers to multiple "acts."

13

Count two required the State to show that Jamison caused temporary injuries. The State met this burden by showing Jamison fractured S.J.'s ribs. For count one, the State needed to show Jamison recklessly inflicted "great bodily harm," defined as "bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ." The State needed to show more than fractured ribs. To meet this higher burden, the State showed that Jamison choked, smothered, and bounced S.J., thus denying her oxygen to the point of causing permanent, irreparable brain damage.

Count two required the State to show that Jamison "engaged in a pattern or practice of assaulting" S.J. To meet this burden, the State showed Jamison fractured S.J.'s ribs about two weeks prior to April 5, about mid-March, Jamison switched from choking to smothering S.J. to avoid detection; and Jamison smothered S.J. in this way "several times in the past." Count one did not require proof of any pattern.

Tyler Jamison contends he suffers double jeopardy because both convictions concern the same statute. He argues because assault is not defined in terms of each physical act against a victim, his actions on April 5 constituted one single assault. This contention is already answered by our mention that the charges included language of acts prior to April 5. We analyze the argument further, nonetheless.

14

When a defendant is convicted of multiple violations of the same statute, the double jeopardy question focuses on what "unit of prosecution" the legislature intends as the punishable act under the statute. *State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002). Tyler Jamison's contention fails because RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii) are functionally different statutory provisions, and thus different units of prosecution.

Chapter 9A.36 RCW and the legislative history for RCW 9A.36.120 do not *expressly* indicate whether the legislature intended for RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii) to be punishable as distinct crimes. But *implicitly*, the language of RCW 9A.36.120 shows the legislature intended different units of prosecution for RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii), rendering each a distinct crime. Each provision within RCW 9A.36.120 addresses a unique concern. RCW 9A.36.120(1)(a) incorporates the definition of first degree assault in RCW 9A.36.011, allowing prosecutors to differentiate between assault of an adult and assault of a child. *See, e.g., State v. Marchi*, 158 Wn. App. 823, 832, 243 P.3d 556 (2010). RCW 9A.36.120(1)(b)(i) criminalizes the intentional assault of a child that recklessly inflicts great bodily harm. This provision thus addresses the legislature's concern for the "particular vulnerability of young victims" by imposing a higher harm requirement than RCW 9A.36.120(1)(b)(ii) but lower intent requirement than RCW 9A.36.011. Last, of the three, RCW 9A.36.120(1)(b)(ii) addresses the legislature's concern for "ongoing

15

abuse of a child" by imposing steeper penalties for an ongoing "pattern or practice" of assault. Thus, in the same way RCW 9A.36.120(1)(b)(i) and RCW 9A.36.120(1)(b)(ii) differ in law, the unit of prosecution also differs. These unique statutory provisions create unique crimes with unique units of prosecution.

SAME CRIMINAL CONDUCT IN SENTENCING

Tyler Jamison asserts a related, but distinct, argument on concerning his sentence as with his convictions. The trial court imposed consecutive, not concurrent, sentences of the two convictions. Jamison contends the sentences violate, not the double jeopardy clause, but the Sentencing Reform Act of 1981, chapter 9.94A RCW, because the convictions were not treated as the same criminal conduct resulting in concurrent sentences.

RCW 9.94A.589(1)(a), the pertinent provision of the sentencing reform act, provides:

> Except as provided in (b) or (c) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the *same criminal conduct* then those current offenses shall be counted as one crime. Sentences imposed under this subsection shall be served *concurrently*. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

(Emphasis added.) RCW 9.94A.589(1)(b) creates an exception to subsection (1)(a) for

serious violent offenses. RCW 9.94A.589(1)(b) provides:

> Whenever a person is convicted of two or more *serious violent offenses* arising from *separate and distinct criminal conduct*, the standard sentence range for the offense with the highest seriousness level under RCW 9.94A.515 shall be determined using the offender's prior convictions and other current convictions that are not serious violent offenses in the offender score and the standard sentence range for other serious violent offenses shall be determined by using an offender score of zero. The standard sentence range for any offenses that are not serious violent offenses shall be determined according to (a) of this subsection. All sentences imposed under (b) of this subsection shall be served *consecutively* to each other and concurrently with sentences imposed under (a) of this subsection.

(Emphasis added.) We hold that, under RCW 9.94A.589, the trial court did not err

when imposing consecutive sentences. We repeat some of the analysis used to determine

if Tyler Jamison's double jeopardy rights were violated.

A judge, rather than a jury, may find the facts necessary to impose consecutive,

rather than concurrent, sentences for multiple offenses. *Oregon v. Ice*, 555 U.S. 160, 129

S. Ct. 711, 172 L. Ed. 2d 517 (2009). This court reviews a same criminal conduct claim

for an abuse of discretion or a misapplication of the law. *State v. Grantham*, 84 Wn.

App. 854, 857, 932 P.2d 657 (1997).

Tyler Jamison concedes first degree assault of a child is a serious violent offense.

RCW 9.94A.030(45)(a)(viii) expressly includes first degree assault of a child within its

definition of "serious violent crime." So subsection (b) of RCW 9.94A.589(1) applies.

17

We ask whether the trial court abused its discretion when concluding that Jamison's two convictions arose from "separate and distinct criminal conduct."

Although "separate and distinct criminal conduct" is not statutorily defined, it is well established that when an offense does not constitute the "same criminal conduct," the offense is necessarily separate and distinct. *State v. Cubias*, 155 Wn.2d 549, 552, 120 P.3d 929 (2005). "A court will consider two or more crimes the 'same criminal conduct' if they: (1) require the same criminal intent, (2) are committed at the same time and place, and (3) involve the same victim." *State v. Price*, 103 Wn. App. 845, 855, 14 P.3d 841 (2000). "All three prongs must be met." *State v. Vike*, 125 Wn.2d 407, 410, 885 P.2d 824 (1994).

"If the intents are different, the offenses will count as separate crimes. If they are the same, we next 'objectively view' the facts usable at sentencing to determine whether a defendant's intent was the same or different with respect to each count." *State v. Hernandez*, 95 Wn. App. 480, 484, 976 P.2d 165 (1999). Where a defendant has the time to "pause, reflect, and either cease his criminal activity or proceed to commit a further criminal act," and the defendant proceeds, he or she forms a new criminal intent. *Grantham*, 84 Wn. App. at 859.

Tyler Jamison intentionally assaulted S.J. repeatedly over the course of several weeks. He began by choking her, pressing his fingers against her throat. Fearing that he might be discovered, Jamison switched to smothering S.J. with his hand. He admitted to

18

bouncing S.J. on the couch on at least two occasions. For each of these acts, Jamison formed a new criminal intent. And while both counts encompass Jamison's conduct on April 5, only count two includes those other assaults.

As for "same time and place," simultaneity is not required. *State v. Porter*, 133 Wn.2d 177, 182, 942 P.2d 974 (1997). Tyler Jamison assaulted S.J. on April 5, between 8:00 a.m. and 11:15 a.m. at their home. Jamison's actions that morning may constitute the "same criminal conduct." But as noted in *State v. Kiser*, 87 Wn. App. 126, 130, 940 P.2d 308 (1997), RCW 9A.36.120(1)(b)

> requires proof of a principal intentional assault which causes substantial bodily harm, and a previous pattern or practice of causing pain. The crime thus is defined *not by a single act, but by a course of conduct.* The definition of the crime permits the State to charge an entire episode of assaultive conduct as one count. The jurors must all find a principal act resulting in substantial bodily harm preceded by a pattern or practice of other assaultive acts.

(Emphasis added.) Thus, as discussed above, count two encompasses more than just the morning of the 5th. Count two includes when Jamison bounced S.J. on the couch previously, when Jamison fractured S.J.'s ribs about two weeks prior, and when Jamison first choked S.J. prior to her March 17 emergency room visit. These assaults occurred at different times other than April 5.

As for "same victim," there is no clear answer. For both counts, the jury found by special verdict that the crime had "a destructive and foreseeable impact on persons other than the victim." CP at 194, 196. S.J. was the primary victim throughout. Her mother,

19

Kelsey Goble, was also the victim because she has the devastating loss of a child. At any rate, count one and count two encompass "separate and distinct criminal conduct" for purposes of RCW 9.94A.589, because count two includes intents and times that count one does not.

## STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds, Tyler Jamison bolsters his claim that both counts constitute the same course of conduct by emphasizing the prosecutor's comment at his arraignment, "I mean, it's the same course of conduct for all intents and purposes regarding the act on that date. It's just a matter of if they find both, I believe it's going to be merged for sentencing purposes." RP at 141. This comment implicates, but does not change, our ruling above. The comment was made before the State amended its complaint to include the two separate counts based upon the alternative means of committing first degree assault of a child.

Tyler Jamison also claims prosecutorial misconduct, pointing to a sarcastic question asked in trial and comments made in closing arguments. "A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial." *State v. Miles*, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). "A defendant establishes prejudice if there is a substantial likelihood the misconduct affected the jury's verdict." *State v. Edvalds*, 157 Wn. App. 517, 522, 237 P.3d 368 (2010).

20

Tyler Jamison first assigns error to the prosecution's cross-examination of his

expert witness, which proceeded:

Q. Tell me about [S.J.]. How did she appear when you saw her?
A. She appeared in the pictures. Is this a sarcastic question? [B]ecause
you know I didn't actually see [S.J.]
Q. Pretty much. I mean—
A. So it is a sarcastic question. Then of course I didn't see her. I saw
pictures of her.
Q. You didn't actually examine [S.J.]?
A. No, I didn't.

RP at 976.

Defendant Jamison did not object to the questioning. "If the defendant fails to

object to an improper remark it is considered waived unless the remark is 'so flagrant and

ill-intentioned that it evinces an enduring and resulting prejudice that could not have been

neutralized by an admonition to the jury.'" *State v. Finch*, 137 Wn.2d 792, 839, 975 P.2d

967 (1999) (quoting *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). The

prosecutor wished to emphasize that Jamison's expert did not personally examine S.J.

This is a permissible method of impeachment. The sarcasm may have harmed the State

more than Tyler Jamison.

Tyler Jamison last assigns errors to multiple remarks in the State's closing

argument. Jamison points to the statement, "She's never going to date; she's never going

to school." RP at 1068. In context, the prosecution was explaining that Kelsey Goble,

because of her youth, did not understand the gravity of S.J.'s injuries and downplayed the seriousness of her daughter's condition.

Tyler Jamison complains about the prosecution saying, "So [S.J.] will be forever blind based upon this injury. That's probably the least of her worries at this point." CP at 1079. But Dr. Reggin testified, "We have discussions with her caregivers about, you know, end-of-life issues, should she be supported or resuscitated." RP at 250. The prosecutor wanted to remind the jury of testimony of the possibility of S.J.'s premature death.

Tyler Jamison assigns error to the prosecutor commenting, "And heaven forbid if that was something that all parents needed to worry about. You better start getting your kid in for an examination every time you knock their head." RP at 1085. In context, the prosecutor argued that an earlier incident, where S.J. bumped her head entering a car, was not the cause of her brain damage.

Tyler Jamison protests the prosecution's remarks, "We have Kelsey Goble who will never have her beautiful perfect first child back. We have Michelle Jamison who will never have her beautiful, perfect first granddaughter back." RP at 1119. With this comment, the prosecution sought to meet its burden of showing that these assaults had a "destructive and foreseeable impact on persons other than the victim" for purposes of that sentence enhancement. RP at 1119. The comments were appropriate.

22

Tyler Jamison assigns error to, "You can't let your emotion or your prejudices guide you in making this decision. And that's going to be extremely hard, because in this case you started out with a little baby who seemed fine." RP at 1108. The prosecution stated this when imploring the jury to follow the court's instructions. In a horrifically emotional trial, the comments would benefit, not prejudice, Jamison.

Tyler Jamison protests the prosecution remarking, "This was during one of the few times—this is her first birthday. She didn't get to eat cake." RP at 1109. The remarks emphasized evidence in the record that S.J. now eats via feeding tube, showing the extent of harm caused, an element of the crime. And last, Jamison assigns error to, "And if you have any, any doubt, I always thought a videotape meant beyond all doubt." RP at 1109. This comment connects admitted evidence to the burden of proof.

In short, Tyler Jamison shows no misconduct nor harm from prosecutorial comments. The prosecutor professionally and effectively performed her role, tying admitted evidence to elements of the crimes charged and to the burden of proof.

## CONCLUSION

We affirm the convictions of Tyler Jamison and his consecutive sentences.

No. 31175-9-III
*State v. Jamison*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____, A.C.J.
Fearing, A.C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

24